

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A black LG cellular telephone | )<br>)<br>)  Case No.   20MJ2575<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A-2, incorporated herein by reference.

located in the       Southern       District of       California      , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 952, 960, 963; | Importation of controlled substance; |

The application is based on these facts:
See attached Affidavit of DEA Task Force Officer Jake Sanchez, incorporated herein by reference.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DEA Task Force Officer Jake Sanchez
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
       telephone       *(specify reliable electronic means).*

Date: 6/30/20

*Judge's signature*

City and state: San Diego, California     Hon. Jill L. Burkhardt, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Task Force Officer Jacob Sanchez, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

    a. A pink and black Samsung cellular telephone (Target Device 1); and

    b. A black LG cellular telephone (Target Device 2) (collectively referred to as the "Target Devices")

As further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960 and 963 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Shawneea RAUCH for importing approximately 220 grams of fentanyl from Mexico into the United States. The Target Devices are currently in the non-drug evidence room located at the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Task Force Officer with the Drug Enforcement Administration since (DEA) since February 2018. I am presently assigned to the DEA San Diego Field Division, Narcotic Task Force (NTF). I have been a Deputy Sheriff with the San Diego Sheriff's Department for approximately 6 years.

4. During my tenure with DEA and other federal task forces, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District

of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. Another common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances with individuals known as body carriers who conceal the narcotics on their persons.

6. With respect to the importation of narcotics in these manners, I am aware that narcotics traffickers in Mexico frequently communicate with the individuals (drivers or body carriers) responsible for driving the vehicle or body carrying the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the driver or body carrier regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the driver or body carrier to remotely monitor the progress of the narcotics, provide instructions to the driver or body carrier and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the driver or body carrier to provide further instructions regarding the transportation of the narcotics to a destination within the United States.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))

can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

8. On June 26, 2020, Shawneea RAUCH and Roxanne ELKASSIS attempted to enter the United States from Mexico via the San Ysidro Port of Entry (SYS POE) Pedestrian Lanes. While walking through the pre-primary area of the port of entry, a narcotics detection K-9 alerted to both RAUCH and ELKASSIS as they were attempting to enter the country. RAUCH and ELKASSIS gave a negative declaration. Both RAUCH

3

and ELKASSIS were escorted to secondary for further inspection.

9. In the secondary inspection area, RAUCH stated she had something in her groin and bra area. CBP officers removed two plastic baggies containing blue pills, identical to pills containing fentanyl. The pills later tested positive for fentanyl and had a weight of 220 grams. RAUCH was then placed under arrest by CBP officers. The pills were seized by CBP Officers and will be submitted to the DEA lab for purity testing.

10. At the SYS POE, SA Gray and TFO Sanchez interviewed RAUCH. TFO Sanchez read RAUCH her Miranda warnings, to which RAUCH stated she understood her rights and was willing to speak with agents. The interview was audio/video recorded. The following is a synopsis of the interview provided by RAUCH.

11. RAUCH said she knew it was illegal to bring narcotics across the international border. RAUCH said she was trying to get her friend "Marcos" out of a problem, because "Marcos" had ran off with people's money. RAUCH said "they" asked RAUCH to smuggle the pills, and had been asking her for about a month. RAUCH said she finally agreed to smuggle the pills because "Marcos" was a good friend to her and this would be a good way to help her friend (Marcos) clear his problems with the people he owed.

12. RAUCH said she went to Tijuana a few hours before her arrest and met with an unknown male and two females. The two females removed the pills from their chest area and gave them to RAUCH and ELKASSIS. RAUCH and ELKASSIS drove around the block with the people they just met and hid the pills on their person. RAUCH and ELKASSIS were dropped off at the border and attempted to smuggle the pills. If RAUCH and ELKASSIS were successful, they were going to retrieve RAUCH's vehicle from the parking lot near the border and drive to Chula Vista. From Chula Vista, they were told they would be driving to Los Angeles, CA. RAUCH said she believed she would receive a phone call once they crossed the border, in order to receive further instructions. RAUCH said she did not know who was going to call her to relay those instructions.

13. During the arrest of RAUCH, agents seized Target Device 1 and Target Device 2, which were in her possession. RAUCH admitted during her post-Miranda

4

interview that Target Device 1 and Target Device 2 belonged to her. The Target Devices are currently in the non-drug evidence room located at the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA.

14. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the Target Devices. In light of the above facts and my experience and training, there is probable cause to believe that RAUCH was using the Target Devices to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as RAUCH, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Devices for data beginning on May 26, 2020 up to and including June 26, 2020.

## METHODOLOGY

15. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data

contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

16. Following the issuance of this warrant, I will collect the Target Devices and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

17. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

18. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

19. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of RAUCH's violations of Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I

request that the Court issue a warrant authorizing law enforcement to search the item described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Task Force Officer Jacob Sanchez
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __30__ day of June, 2020.

_____
Honorable JILL BURKHARDT
United States Magistrate Judge

7

# **ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

The following property is to be searched:

    b.  A black LG cellular telephone (Target Device 2)

Target Device 2 is currently in the possession of Drug Enforcement Administration, 4560 Viewridge Avenue, San Diego, CA.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the Target Devices described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.  The seizure and search of the Target Devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 26, 2020, up to and including June 26, 2020:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, heroin, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.